UNITED STATE DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MOHAWK GAMING ENTERPRISES, LLC )<br>873 State Route 37 )<br>Akwesasne, New York 13655 )<br>)<br>         Plaintiffs, )<br>)<br>)<br>  v. )<br>)<br>)<br>AFFILIATED FM INSURANCE CO. )<br>270 Central Avenue )<br>P.O. Box 7500 )<br>Johnston, RI 02919-4949 )<br>)<br>        Defendant. )<br>_____ ) | CIVIL ACTION NO. 8:20-CV-0701<br>(DNH/DJS) |

## COMPLAINT

### NATURE OF THE CASE

1.  On March 16, 2020, in response to a COVID-19 incident in a nearby town, the
Saint Regis Mohawk Tribe (Tribe) issued a civil order of closure to the Akwesasne Mohawk
Casino Resort (AMCR), a business owned by the Insured Mohawk Gaming Enterprises (MGE).
This closure has resulted in significant income losses that are covered by MGE's business
interruption policy with Affiliated FM.  However, Affiliated FM has declined coverage on
nonsensical and deceitful grounds.  MGE seeks a declaration that it is legally entitled to
insurance coverage under the "Business Interruption—Civil Authority" section of its all-risk
property insurance policy (Policy) purchased from Insurer Defendant Affiliated FM.  MGE also

seeks substantial damages for breach of contract, violation of state law governing deceitful practices and fraud.

2.      MGE's Property Insurance Policy, Exhibit 1, consists of two parts.  Part One covers property damage and includes coverage for "Communicable Disease – Property Damage."  Part Two covers business interruption and includes an extension of business interruption coverage due to Civil Authority closure. Section E.2.  Exh. 1 at P0037.

3.      The civil authority section of the insurance contract sets forth three specific criteria to establish coverage: (a) that an order of civil or military authority prohibits access to a location; (b) provided such order is the direct result of physical damage of the type insured; (c) at a location or within five statute miles of it.

4.      On March 15, 2020, Saint Lawrence College in Cornwall, Ontario (College), located 4.5 miles from the AMCR, was closed due to the actual presence of coronavirus COVID-19 on the campus.

5.      On March 16, 2020, in reaction to and as a direct result of the actual presence of the coronavirus COVID-19 at the College and the College closure, the Tribe declared a state of emergency on the reservation and separately issued a closure order to the AMCR.

6.      AMCR has been closed since March 17, 2020 under the civil authority order and MGE has suffered significant business interruption losses.

7.      On March 19, 2020, MGE notified Affiliated FM that it intended to claim coverage under the business interruption civil authority section of the policy.  In that notice, MGE did not state or refer to any facts that alluded to the actual presence of a communicable disease at AMCR.  Rather, MGE based its claim on the lost earnings it is suffering due to the civil closure order and because the circumstances of the closure met the criteria of the contract's

Section E.2 for civil authority losses.  (From time to time during the pendency of this claim, AMCR has acted as MGE's agent in submitting documentation and requests to Affiliated FM.)

8.      When first notified of MGE's claim, Affiliated FM inexplicably acknowledged the claim as one for "communicable disease" coverage.

9.      MGE repeatedly asked Affiliated FM to revise that designation and to provide whatever forms were necessary to make a civil authority claim. Affiliated FM ignored these requests and repeatedly sought to intentionally steer MGE to a claim under the communicable disease section of the contract of insurance.  In so doing, MGE had full knowledge that the communicable disease provision would not be applicable without an actual presence of the disease and, even if the disease were present, there would be no recovery because of the Policy sublimit and deductible.

10.      To head off MGE's claim, then, on May 4, 2020, prior to the submission of MGE's official proof of loss, Affiliated FM sent a letter to MGE which set out three points in analysis of the MGE proVision Policy: (a) a virus is a contaminant and any claim for contamination is excluded under the Policy; (b) the civil authority section requires "physical damage" and the presence of a communicable disease does not qualify as physical damage; and (c) the only potential claim under the Policy is for property damage under the communicable disease section because COVID-19 is a qualifying communicable disease.  A true and correct copy of this correspondence is attached as Exhibit 2.

11.      Despite Affiliated FM's efforts, MGE, by its agent AMCR, has continued to assert the claim under the civil authority provision in the Policy.  MGE timely tendered its formal Proof of Loss on May 12, 2020 with evidence in the form of several witness statements,

documents, and spreadsheets.  Despite the passage of more than 30 days, MGE has yet to receive a response from Affiliated FM.

12.     Since that submission, MGE learned that Affiliated FM has adopted a company-wide position, titled "talking points" which provides all adjusters (not just the adjuster assigned to MGE's claim) with direction and instructions on how to respond to COVID-19 claims.  A true and correct copy of Affiliated FM's Talking Points is attached as Exhibit 3.

13.     The May 4, 2020 letter from Affiliated FM predictably followed this set of talking points.  The talking points advise that civil authority coverage is not available for COVID-19 closures because the civil authority section requires "physical damage," and the presence of a virus does not qualify.   The talking points advise that the presence of the coronavirus is "property damage" if there is the actual presence of a communicable disease, but that same actual presence of the disease is not to be construed as "physical damage" under the civil authority provision.  Finally, the talking points advise that if coronavirus is present, it is a virus that falls under the more general category of "contamination" and is therefore completely excluded from coverage under the Policy.  But the "communicable disease" section of the Policy is still available for a claim if an insured can prove the actual presence of the disease.  This reasoning is circular and contradictory because, as is well known, COVID-19 is a virus that causes a disease.

14.     The Affiliated FM positions set forth in its May 4, 2020 letter are identical to the talking points which are being put forth in an unfair and deceitful manner.  Affiliated FM has devised an interpretation of the Policy – which is a contract of insurance – that will allow it to engage in the blanket denial of all claims for coverage related to the coronavirus regardless of

4

investigation or facts, not just as applied to MGE, but to any insured seeking to recover for COVID-related damages under Affiliated FM's standard-form policies.

15.     MGE seeks a declaration that it is entitled to business interruption coverage under its Policy because it has been closed by civil order and it has met the Policy conditions that the closure order was a direct result of physical damage of the type insured, that is, the presence of a communicable disease at a location within five miles of the insured property.

16.     MGE seeks a declaration that Affiliated FM has breached the contract that requires it to cover a validly-asserted claim within a reasonable amount of time, which the Policy defines as 30 days and further seeks a declaration that Affiliated FM has breached the implied duty of good faith applicable to the contract by virtue of its internal policy to deny all claims on specific grounds regardless of facts or investigation.

17.     MGE seeks an order that Affiliated FM has violated New York General Business Law § 349 by engaging in deceitful and unlawful practices by mischaracterizing MGE's claim and by applying a pre-conceived and prepared (feigned) basis for denial of any and all COVID-19 claims related to civil closure orders in regard to consumers such as MGE, which purchased the property insurance policy and paid premiums based on its reasonable reliance that the insurance carrier would comply with its contractual and statutory duties to investigate and settle claims fairly.

18.     MGE seeks a finding that Affiliated FM engaged in a pattern of misconduct against MGE in fraudulently denying coverage based on a contorted interpretation of the Policy that was adopted by the Insurer on a company-wide basis to create a pre-conceived and prepared basis for denial of any COVID-19 claim that may be related to civil closure orders.

19.     MGE seeks compensatory, consequential, and punitive damages as well as attorneys' fees and expenses for the wrongs described herein.

## PARTIES

20.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

21.     MOHAWK GAMING ENTERPRISES (MGE) is a Limited Liability Company formed under the laws of the Saint Regis Mohawk Tribe (the Tribe) and is the Insured party under the Policy.  MGE is located on the Saint Regis Mohawk Indian Tribe Reservation in Franklin County, New York.  MGE is the owner of Akwesasne Mohawk Casino Resort (AMCR), a casino/hotel operation located on the Reservation.

22.     AFFILIATED FM is an insurance company incorporated in the State of Rhode Island.  Affiliated FM, which is part of the FM Global Group, is registered to sell insurance in New York State under NAIC# 10014.  Affiliated FM is represented by an insurance agent in New York who worked with MGE/AMCR on its policies.  Affiliated FM has engaged in business interactions with MGE and AMCR from its offices in Woodland Hills, California.

## JURISDICTION

23.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

24.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (a)(1) and (c)(1), because there is complete diversity of citizenship between Plaintiff and the Defendant.

25.     Further, Plaintiff MGE's insurance claim is greater than $75,000.00.  28 U.S.C. § 1332(a).  The Court has personal jurisdiction over Defendant because at all relevant times it has engaged in substantial business activities in the State of New York. At all relevant times Defendant transacted, solicited, and conducted business in New York through its employees,

agents, and/or sales representatives, and derived substantial revenue from such business in New York.  At all relevant times, Defendant used the worldwide Internet to market its products, including the proVision policy at issue herein, to consumers in New York.

26.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because a substantial portion of the wrongful acts upon which this lawsuit is based occurred in this District. Venue is also proper pursuant to 28 U.S.C. § 1391(c) because Defendant is a corporation that has substantial, systematic, and continuous contacts in the State of New York, and as a result, it is subject to personal jurisdiction in this District.

27.     This Court has jurisdiction to grant declaratory relief under 28 U.S.C. § 2201 because an actual controversy exists between the parties as to their respective rights and obligations under the Policy with respect to the loss of business arising from the civil authority event detailed below.

## FACTUAL ALLEGATIONS

28.     Plaintiffs incorporate by reference, as if fully set forth herein, the allegations in the foregoing paragraphs.

### Insurance Policy

29.     In return for the payment of substantial premiums, Defendant issued to MGE a property insurance policy, No. SS722 (Policy).  Exh. 1.  The Policy is a standard issue Policy known as the "proVision" policy.  Exh. 1 at P0011 (header).  Plaintiff made all premium payments, and the Policy was in effect for a one-year period with coverage through and including July 1, 2020.  Exh. 1 at P0003.  The Policy covers three locations, one of which is at issue here -- 873 State Route 37, Hogansburg, NY 13655, where the main casino and resort are

located.  Exh. 1 at P0004.  The Policy is an all-risk property damage policy, covering "all risk of

physical loss or damage" unless excluded. Exh. 1 at P0014.

      30.     The Policy includes several specific policy extensions to cover lost earnings due

to business interruption, one of which is most relevant here:  business interruption due to civil

authority order.  Policy Section E.2 titled "Civil or Military Authority," does not include any

exclusions or exceptions to the type of "physical damage" that may be claimed so long as it is of

the type insured:

> This Policy covers Business Interruption Coverage loss incurred by the Insured
> during the Period of Liability if an order of civil or military authority prohibits
> access to a location provided such order is the direct result of physical damage of
> the type insured at a location or within five statute miles of it.
>
> Item B. 3. of Property Excluded does not apply to this Business Interruption
> Coverage Extension.
>
> The Period of Liability for this Business Interruption Coverage Extension will be:
>
>  a) The period of time starting at the time of such order of civil or military
> authority, but not to exceed the number of consecutive days shown in the
> Declarations section of this Policy.

Exh. 1 at P0037-38.

      31.     The Policy defines the presence of a communicable disease as "property damage."

Section D.5, titled "Communicable Disease - Property Damage," is located in the property

damage section of the policy.  Property damage from a communicable disease is covered if there

is the "actual presence" of the disease and access to a location is limited by order. Exh. 1 at

P0020.  It provides that it will cover "the reasonable and necessary costs incurred by the Insured

at such described location for the: a) Cleanup, removal and disposal of such presence of

communicable disease from insured property...."

32.     The terms "Property damage" and "physical damage" are not otherwise defined in the Policy.

33.     "Communicable disease" is defined as a "disease that is transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges." Exh. 1 at P0055. The Communicable Disease Section encompasses all diseases and does not exclude a disease that is caused by a virus.

34.     The Policy contains a general exclusion for "contamination" which is defined as "any condition of property due to the actual or suspected presence of any foreign substance, impurity, . . . pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, . . . ." Exh. 1 at P0018, P0055.

35.     Because a disease can be caused by a virus, the word "virus" would naturally be subsumed into the word disease, and the more specific "communicable disease" provision is an exception to the more general contamination-by-a-virus exclusion.

36.     The Period of Liability for the Civil Authority coverage is sublimited to 30 days. Exh. 1 at P0006. However, MGE further purchased a business interruption extension entitled "Extended Period of Liability," Section E. 7, which extends the Period of Liability for Gross Earnings coverage to "the length of time as would be required with the exercise of due diligence and dispatch to restore the Insured's business to the condition that would have existed had no loss happened...." Exh. 1 at P0039-40. This section carries a Policy sublimit as set forth in the Declarations of 365 days. Exh. 1 at P0006.

**CDC Guidance**

37.     According to the Center for Disease Control and Prevention (CDC), the coronavirus COVID-19 spreads easily form person to person. The CDC website states:

**Person-to-person spread**

**The virus is thought to spread mainly from person-to-person.**

- Between people who are in close contact with one another (within about 6 feet).
- Through respiratory droplets produced when an infected person coughs, sneezes, or talks.
- These droplets can land in the mouths or noses of people who are nearby or possibly be inhaled into the lungs.
- COVID-19 may be spread by people who are not showing symptoms.

**The virus spreads easily between people**

How easily a virus spreads from person-to-person can vary. Some viruses are highly contagious, like measles, while other viruses do not spread as easily. Another factor is whether the spread is sustained, which means it goes from person-to-person without stopping.

**The virus that causes COVID-19 is spreading very easily and sustainably between people.** Information from the ongoing COVID-19 pandemic suggest that this virus is spreading more efficiently than influenza, but not as efficiently as measles, which is highly contagious. In general, **the more closely a person interacts with others and the longer that interaction, the higher the risk of COVID-19 spread.**

https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html.

(Last accessed June 22, 2020).

38.     According to the CDC, there are many factors to consider if a person with

COVID-19 has been in a room or facility:

Current evidence suggests that SARS-CoV-2 may remain viable for hours to days on surfaces made from a variety of materials. Cleaning of visibly dirty surfaces followed by disinfection is a best practice measure for prevention of COVID-19 and other viral respiratory illnesses in community settings.

It is unknown how long the air inside a room occupied by someone with confirmed COVID-19 remains potentially infectious. Facilities will need to consider factors such as the size of the room and the ventilation system design (including flowrate [air changes per hour] and location of supply and exhaust vents) when deciding how long to close off rooms or areas used by ill persons before beginning disinfection. Taking measures to improve ventilation in an area

or room where someone was ill or suspected to be ill with COVID-19 will help
shorten the time it takes respiratory droplets to be removed from the air.

https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/cleaning-

disinfection.html.  (Last accessed June 22, 2020).

39.    According to the CDC, if a confirmed infected person has been in a community

facility, the following actions are recommended:

Definitions

*Community facilities* such as schools, daycare centers, and businesses comprise
most non-healthcare settings that are visited by the general public outside of a
household.

*Cleaning* refers to the removal of dirt and impurities, including germs, from
surfaces. Cleaning alone does not kill germs. But by removing the germs, it
decreases their number and therefore any risk of spreading infection.

*Disinfecting* works by using chemicals, for example EPA-registered disinfectants,
to kill germs on surfaces. This process does not necessarily clean dirty surfaces or
remove germs. But killing germs remaining on a surface after cleaning further
reduces any risk of spreading infection.

**Cleaning and Disinfection After Persons Suspected/Confirmed to Have COVID-19
Have Been in the Facility**

**Timing and location of cleaning and disinfection of surfaces**

- At a school, daycare center, office, or other facility that **does not house people
  overnight**:

  o   Close off areas visited by the ill persons. Open outside doors and
      windows and use ventilating fans to increase air circulation in the area.
      Wait 24 hours or as long as practical before beginning cleaning and
      disinfection.

  o   **Cleaning staff should clean and disinfect all areas such as offices,
      bathrooms, common areas, shared electronic equipment (like tablets,
      touch screens, keyboards, remote controls, and ATM machines) used
      by the ill persons**, focusing especially on frequently touched surfaces**.**

11

https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/cleaning-disinfection.html.  (Last accessed June 22, 2020).

**Closure Order**

40.     On March 15, 2020, the President of St. Lawrence College in Cornwall, Ontario, located 4.5 miles from the AMCR, closed the College due to the presence of a positive coronavirus case at the campus.  A student who had recently traveled to New York City had a test-confirmed case of the coronavirus, COVID-19, a communicable disease.  The student's attendance at a class while infected resulted in the closure of the campus.  According to news reports, four contacts of the infected person, including one contact at the college itself, were asked to self-isolate.

41.     The president of the College stated in a March 17 blog post:

On Sunday, March 15, 2020, St. Lawrence College (SLC) was informed of a confirmed case of COVID-19 in our Cornwall campus community. This individual was diagnosed at a local hospital, treated, and is at home under self-isolation. Upon receiving this news, SLC took extreme preventative measures to ensure our campus community including students, staff, and faculty were not exposed.

These preventative measures included restricting access to campus until further notice to determine the extent of possible exposure.  Elevated infection prevention protocols were undertaken, which included thoroughly cleaning communal spaces and specific areas where the individual may have been.

*See* https://www.stlawrencecollege.ca/about/information-on-covid-19.  (Last accessed June 18, 2020).

42.     The President of the College ultimately closed the school to all but essential employees to address the concern over the potential for more exposure of its students and further damage to the campus facilities.  *See id.* (March 17 blog post).  College classes have since

moved on-line.  To date, the College has not been able to operate as it did prior to the presence of the disease because the virus continues to be present in the community.

43.     In response to the reported COVID-19 case and the College closure, the Tribe decided it had to act.  Members of the Tribe's Emergency Management and Safety Department met with officials from Mohawk Council of Akwesasne, its Canadian counterpart, where it was agreed that a joint emergency declaration would be issued for the Akwesasne Territory including the American reservation.  See https://www.srmt-nsn.gov/_uploads/site_files/TCR-2020-17-Declare-A-State-of-Emergency-for-the-Community-of-Akwesasne.pdf.  (Last accessed June 18, 2020).

44.     In addition, prompted by the incident at the College, on March 15, 2020, members of Tribal Council contacted the MGE Board Chair and members of the casino management to ask whether the casino would be closing.  Chief Beverly Cook forwarded by text to the Chair of the MGE Board the St. Lawrence College notice about the incident and the closure.  She also spoke directly to the Chair to ask if the casino intended to close.  Similarly, Chief Michael Conners contacted casino management urging closure because the community sought reassurance after the incident at the College that the casino would close.

45.     Separately, the casino management and MGE Board had met and decided AMCR would continue to operate under the same operational parameters being followed by the New York state-licensed gaming facilities, *i.e.,* with social distancing measures, limited access and frequent cleaning.  MGE had not yet addressed Council's concerns.

46.     On March 16, 2020, the members of the Tribal Council met with MGE representatives and AMCR management to discuss the need to close the casino.  The management explained that it wanted to continue operating with appropriate measures in place.

But in that meeting, the Tribal Council raised the issue of the incident at St. Lawrence College as a matter of serious concern.  The casino has many patrons from Cornwall.  The Tribal Council members' concerns about the Cornwall case were such that the Council advised MGE that it intended to close the casino.

47.      On March 16, 2020, the Tribe issued a written order closing the casino at 2:00 a.m. on March 17, 2020.  See https://www.srmt-nsn.gov/_uploads/site_files/TCR-2020-18-Akweasne-Mohawk-Casino-Resort-Closure-Order.pdf.  (Last accessed June 18, 2020).  The Tribal Council acted based on the presence of a communicable disease at St. Lawrence College in Cornwall, Ontario which is only a few miles from the reservation.  COVID-19 is inherently noxious, and its presence renders business and buildings unusable and unsafe.  The Closure Order states in part:

> WHEREAS, it is in the interest of the Tribe to protect its employees, guests to the territory, and its property and assets; and
>
> WHEREAS, public accommodations and meeting places, restaurants and businesses that host large gatherings can be a vector for the spread of COVID-19; and
>
> WHEREAS, to prevent exposure to the virus, health officials recommend social distancing and avoidance of gatherings in public places; and
>
> WHEREAS, in cases of buildings that may have had positive coronavirus visitors, such buildings must be fully disinfected and can be placed off limits; and
>
> WHEREAS, the Tribe hosts visitors on its territory from Canada and the United States and COVID- 19 cases have been identified in the State of New York, in the provinces of Ontario and Quebec and in Cornwall, Ontario; and
>
> WHEREAS, on Enniskó:wa/March 16, 2020, the Tribal Council executed a Tribal Council Resolution to "Declare a State of Emergency for Community of Akwesasne" (TCR 2020-17) due to the worldwide outbreak of the COVID-19.
>
> NOW, THEREFORE, BE IT RESOLVED, in the interest of public health and safety and in the interest of preservation of life and property, the Saint Regis Mohawk Tribal Council hereby orders the temporary closure of the Akwesasne

Mohawk Casino Resort effective Tuesday, Enniskó:wa/March 17, 2020, at 2:00 a.m. and shall remain closed until further notice is issued by the Tribal Council.

48.     To recover under Section E.2 of the Policy, MGE must show:

   a) an order of a civil authority prohibits access to a location;

   b) provided such order was a direct result of physical damage of the type insured;

   c) at the location or within five miles of the location.

49.     The Tribal Closure Order meets these criteria.  The Order prohibits access to the location.  The Order was issued as a "direct result of physical damage of the type insured."  The Tribe acted when the active case incident occurred at the College.  The College is 4.5 miles away.  The presence of COVID-19 is a "physical damage of the type insured."  The Policy, Section D.5, expressly includes Communicable Diseases in the Property Damages part of the Policy.  The disease was actually present at the College.  The student tested positive and, under CDC Guidelines, if a positive person has been present, then the disease is present wherever that person has been and on whatever surfaces with which that person has had contact because of its longevity.

50.     When the disease is present, there is a need to restrict access to a building and to decontaminate due to the presence of a positive individual.  Because of the presence of COVID-19 in the community, the clean-up effort in the College did not result in the school (or the Casino) being restored to "the condition that would have existed had no loss happened."  In order to return to the conditions that existed prior to the presence of the disease, those conditions, being the presence of many people engaged in activities in a safe manner, the College (and the Casino) will have to invest in modifications of facilities and develop safety protocols that presumes the presence of many people engaged in activities in a safe environment.  Both the

AMCR and the College remain closed until they can be safely reopened with appropriate protocols.

## Communications with Defendant

51.     On March 10, 2020, the New York State Department of Finance sent a notice to all insurers authorized to do business in New York instructing them to make an examination of all policies issued in New York to determine if those policies included coverage for business interruption or civil authority coverage and notify each insured of the policy parameters. *See* https://www.hinshawlaw.com/assets/htmldocuments/Alerts/NYDFS%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.pdf. (Last accessed June 18, 2020).

52.     MGE never received any such information from Affiliated FM regarding coverage under the Policy.

53.     In an undated memorandum prepared for its adjusters and agents entitled "Talking Points on the 2019 Novel Coronavirus (2019 nCo-V)," Affiliated FM instructed its employees use scripted, specific responses to common questions that were being asked by insureds about their insurance policies, including the standard AFM proVision policy that MGE had purchased.  Exh. 3.

54.     The "talking points" provides all adjusters with direction on how to respond to COVID-19 claims including instructing that (a) civil authority coverage is not available for COVID-19 closures because the civil authority section requires "physical damage" and the presence of a virus does not qualify; (b) the presence of the coronavirus is "property damage" if there is the actual presence of a communicable disease, but that same actual presence of the disease is not to be construed as "physical damage" under the civil authority provision; and (c) if

coronavirus is present, it is a virus that falls under the more general category of "contamination" and is therefore completely excluded from coverage under the Policy.  Exh. 3 at P0072-73.

55      The reasoning in the talking points is circular and contradictory because, as is well known, COVID-19 is a virus that causes a disease, and communicable diseases are "property damage" which under any construction of the phrase is and must be "physical damage." Exh. 3 at P0073.

56.     The "talking points" memorandum also advises that if an employee at an insured location has a confirmed medical diagnosis, it would be considered the "actual presence" of the disease under the communicable disease section of the Policy.

57.     On March 19, 2020, MGE notified Affiliated FM in writing that it intended to make a claim under Section E.2 of the Business Interruption Extension Coverage, Civil and Military Authority for losses incurred due to the issuance of a civil closure order by the Saint Regis Mohawk Tribe.  Members of AMCR were also in contact with their insurance agent to explain the claim.  The insurance agent at that time advised that MGE only had a claim under the communicable disease section of the Policy and that MGE had to consider the deductible and sublimit in assessing whether to make a formal claim.

58.     On March 20, 2020, Defendant acknowledged receipt of MGE's notification but rather than describe the claim as one for civil authority closure, Affiliated FM described the claim as one under the "Communicable Disease" section of the policy.  MGE made several efforts to have Affiliated FM correct this designation of its claim.  Defendant failed to respond to these requests.

59.     On March 23, 2020, AMCR management spoke to the Affiliated FM adjuster (William Frost) to explain the basis for MGE's civil authority claim.  The adjuster insisted that

the MGE claim could be made only under the communicable disease section of the Policy.  He advised that even if MGE could establish the actual presence of the disease at the Casino, with a claim limit of $100,000 and a deductible equivalent to two days of losses for business interruption, MGE likely had no claim to make.  Still, he agreed to send to AMCR a request for information form (RFI) for AMCR to fill out and return.

60.     Not having received the RFI, on April 8, 2020, AMCR again contacted the adjuster about the RFI.  The adjuster forwarded an RFI for a communicable disease claim.  On April 9, 2020, the attorney for MGE contacted the adjuster by email explaining the MGE claim was not for communicable disease coverage and asked for the RFI for civil authority coverage. The requested RFI was never provided.

61.     On May 4, 2020, unprompted and before MGE had submitted its Sworn Statement in Proof of Loss, Affiliated FM sent a letter to AMCR that reflected the positions set forth in the talking points memorandum.  Exh. 2.  The letter was based on an assumption of facts that were never presented by MGE.

62.     The Affiliated FM letter explained that the contract of insurance's civil authority provision required "physical loss or damage of the type insured."  The letter suggested that MGE could not meet this condition for two reasons:  the MGE Policy excluded any claim based on contamination and the presence of the virus was not physical damage.  Exh. 2 at P0069.

63.     The letter then stated the contradictory position that COVID-19 "meets Policy's definition of a communicable disease."  Exh. 2 at P0069.  Although not quoted in the letter, the definition of "communicable disease" is "a disease that is transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges."  The letter went on to repeat Affiliated FM's pre-scripted position that communicable diseases coverage

was the only possible basis for a claim, that MGE has failed to provide information to substantiate a communicable disease claim, and even if it had, the deductible and sublimit applied.  Exh. 2 at P0069-70.

64.    On May 12, 2020, MGE via it agent, AMCR, sent a Sworn Statement in Proof of Loss letter to Affiliated FM detailing the circumstances of the civil authority order issued by the Tribe and presenting evidence to support its valid claim for coverage under Section E. 2 of the Policy.  Specifically, a civil closure order was issued to AMCR as a direct result of physical damage of the type insured under MGE's policy (communicable disease) that occurred at a location within five miles of the MGE/AMCR location.

65.    On May 27, 2020, Affiliated FM acknowledged the receipt of the Sworn Statement.

66.    On June 15, 2020, MGE through AMCR submitted a supplement to its Sworn Statement in Proof of Loss to add an additional month of damages.  In that letter, MGE requested that if the talking points were to be used to deny the claim, that a detailed explanation be provided as to why "property damage" does not constitute "physical damage."

67.    Despite the 30-day deadline set out in the Policy for discussion and investigation of the claim and settlement, Exh. 1 at P0047, as of the date of this Complaint, Affiliated FM has not responded to the submitted Sworn Statement in Proof of Loss.

## CAUSES OF ACTION

### Count 1 - Declaratory Judgment

68.    Plaintiff incorporates by reference, as if fully set forth herein, the foregoing allegations.

69.     MGE entered into a contract with Affiliated FM in which MGE paid premiums in return for which Affiliated FM promised to reimburse MGE for losses covered by the Policy. MGE has suffered business interruption losses due to the issuance of a civil closure order, and such loss is a covered loss under Section E.2 of the Policy.

70.     MGE complied with all applicable provisions of the Policy, including payment of the premiums in exchange for coverage under the Policy.

71.     MGE cooperated at all times in the adjusting of its claim.

72.     MGE has provided a Sworn Statement in Proof of Loss including substantial evidence in the form of sworn statements, documents, spreadsheets and calculations to support its claim for coverage.

73.     Affiliated FM has arbitrarily and without justification repeatedly refused to acknowledge MGE's claim under the Business Interruption-Civil Authority section of the Policy. Affiliated FM has denied reimbursement for the losses incurred in connection with the covered business losses related to the Closure Order and the interruption of its business stemming from the order.  Affiliated FM has consistently claimed without justification that MGE may make a claim only under the Communicable Disease section of the Policy.

74.     An actual case or controversy exists regarding MGE's rights under the Policy and Affiliated FM's obligations under the Policy to reimburse MGE for the full amount of losses incurred in connection with Closure Order and the ensuing interruption of its business, AMCR, stemming from the order.

75.     As a result of the aforesaid, MGE is entitled to a declaration that: (a) the presence of a communicable disease is "physical damage" and (b) that MGE's claim falls within the terms of the Business Interruption-Civil Authority section of the Policy.

## **Count 2 - Breach of Contract**

76.     Plaintiff incorporates by reference, as if fully set forth herein, the facts set forth in the foregoing paragraphs.

77.     The Policy is an insurance contract under which Affiliated FM was paid premiums in exchange for its promise to pay MGE losses for claims covered by the Policy, such as business interruption losses incurred as a result of a government order forcing its business, AMCR, to close.

78.     MGE has complied with all applicable provisions of the Policy, including payment of the premiums in exchange for coverage under the Policy.

79.     MGE provided prompt notice of its claim to Defendant.

80.     MGE has cooperated at all times in the adjusting process and has otherwise fulfilled any conditions precedent to payment.

81.     Affiliated FM has failed to comply with its contractual insurance coverage obligations pursuant to the Policy's clear and unambiguous terms which allow a claim for business interruption for earnings losses when such losses are due to a civil closure order.

82.     Affiliated FM has failed in its duties of good faith and fair dealing under the insurance contract and State law by: (a) failing to inform MGE of the terms of its policy as instructed by the New York Department of Financial Services, (b) failing to respond to repeated requests for forms necessary to make a claim under the Civil Order section of the policy, (c) repeatedly defining MGE's claim contrary to the facts provided by MGE, (d) denying the request to cover MGE's losses by using a prepared and preconceived rational that the Insurer intended apply to all claims for COVID-19 coverage, specifically to deny civil authority coverage under specious reasoning, and, (e) generally denying MGE is covered under the Policy

without having the full set of facts and without making an effort to learn the facts, *e.g.,* no inspection, no request for records, and otherwise.

83.     By its conduct, Defendant violated the implied covenant of good faith and fair dealing in its claim handling.

84.     Because the casino is closed for business but intends to reopen in the future, MGE continues to incur expenses to keep the essential functions of the AMCR going including payments of utilities, security and maintenance.  While MGE managed to negotiate the suspension of numerous payments to vendors, some vendors continue to insist on payment. Even if some vendors have agreed to suspension of payments on contracts, this only means that MGE will owe a significant amount of money in the future which it may not have since it has been steadily drawing down its reserves due to the lack of a fair and/or prompt adjustment of its claims.

85.     MGE has had to lay off most of its work force.  As a self-insured entity for this purpose, MGE must make millions of dollars in unemployment payments to the State of New York for its laid-off workers.

86.     MGE has had to renegotiate its current financing arrangement with its bank to include very strict terms with deferred payments being added to a future balloon payment.

87.     MGE has also delayed making millions of dollars in payments to the State of New York owed under its Tribal State Gaming Compact.  Those payments too will be coming due.

88.     To date, MGE is using its limited cash reserves to pay for these continuing expenses and has drawn down $6.945 million in funds to cover these ongoing expenses.

89.     In these circumstances, it is also likely that MGE will exhaust the cash reserve funds it is using now to keep the AMCR in some semblance of order until a re-opening.  It is forecast that by September, having accessed most of its cash reserves, MGE will have to take out a loan, if it even qualifies at that time, to continue with even more limited operations.

90.     Affiliated FM understood that if it denied business interruption coverage intended to provide needed funds at a time when MGE's business was fully suspended, that MGE would be forced to cover lost income, ongoing expenses and extra expenses using other sources of funds.  MGE's lost income and MGE's drawdown of these cash reserves to cover expenses, a drawdown that is an ongoing monetary loss, is a direct and foreseeable consequence of Affiliated FM's wrongful conduct in refusing to provide the business interruption coverage to which MGE is entitled..

91.     The loss of these reserves, being used in place of insurance coverage, is a significant damage that was contemplated by the parties at the time of the contracting because wrongful conduct by the Insurer in refusing to provide business interruption coverage would necessarily cause MGE additional monetary losses.

92.     By denying coverage for the business interruption losses incurred by MGE in connection with the Closure Order, Affiliated FM has breached its contractual coverage obligations under the Policy.  As a result of the breach, MGE has proximately sustained substantial compensatory and consequential damages.

**Count 3 – Violation of New York General Business Law § 349**

93.     Plaintiff incorporates by reference, as if fully set forth herein, the facts set forth in the foregoing paragraphs.

94.     New York General Business Law § 349(a), entitled Deceptive acts and practices unlawful, declares that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

95.     The all-risk insurance Policy at issue is a standard form contract prepared by Affiliated FM entitled the "proVision" policy that is offered to businesses generally for commercial real property coverage.

96.     There was no negotiation between MGE and Affiliated FM to include specific terms or coverage different from the standard form.  MGE worked only with an insurance agent in its dealings with Affiliated FM.

97.     Affiliated FM markets itself as catering to the needs of businesses with exceptional service and knowledge:

> AFM's experienced and knowledgeable engineers are experts at identifying loss drivers for specific industries and helping our clients mitigate them. And our production underwriters are skilled at helping you and your broker craft a policy tailor-made for your business. AFM coverage can be customized to cater to the needs and challenges specific to your business by adding one or more endorsements to your proVision® policy.

*See* https://www.affiliatedfm.com/property-coverage/industries.  (Last accessed June 20, 2020).

98.     To the world, including consumers in New York, Affiliated FM publicly and falsely advertises itself as "responsive," "ready to work hard," and that it ensures "fast" claims resolutions:

> We take claims handling seriously, and strive to be the best in the business. When an event occurs, we are dedicated to getting businesses back to work as quickly and efficiently as possible. We have a highly responsive and empowered claims staff ready to work hard for businesses and ensure fast and reliable claims resolutions.
>
> Our claims handling process is streamlined for the middle market. This allows for a nimbleness you won't find in other commercial insurance

companies. With AFM, you can file a claim with the confidence you'll
receive fair and equitable settlements, prompt on-site loss guidance and
rapid back-to-business strategies.

*See* https://www.affiliatedfm.com/claim-handling/overview.  (Last accessed June 20, 2020).

99.     These statements of alleged fact are intended to induce prospective insureds such

as MGE to enter into contracts of insurance and pay significant premiums to Affiliated FM.

These statements are false, are directed to the New York public at large via the Internet, and are

detrimental to the public interest.

100.     Affiliated FM also admits that its proVision contract of insurance offers broad all-

risk coverage and contends that its coverage language is "clear and straightforward" in order to

ensure "contract certainty:"

Our proVision® policy offers broad all-risk coverage in a comprehensive
yet easy-to-navigate form. The document is concise and the policy
language is clear and straightforward, ensuring contract certainty. In
addition to covering Real Property, Personal Property and Business
Interruption, the base proVision platform offers numerous advantages,
including coverage for first-party property cyber loss, equipment
breakdown and supply chain disruption.

*See* https://www.affiliatedfm.com/property-coverage/provision-policy.  (Last accessed

June 20, 2020).

101.     Despite the marketing assurances that it would process claims honestly, fairly and

with clarity, in their words, "fair and equitable settlements, prompt on-site loss guidance and

rapid back-to-business strategies," when MGE notified Affiliated FM that it intended to make a

claim for the closure of AMCR under the civil authority section of the Policy, Affiliated FM

engaged in a pattern of misdirection and deception in its efforts to steer MGE to one type of

coverage under the Policy, communicable disease, knowing that this coverage would not result

in any payment for losses.

25

102.    Despite direct statements by the policyholders such as MGE that they were claiming damages under the civil authority coverage, the attempts to steer policy holders to the communicable disease section was a result of Affiliated FM's development of a strategy to systemically mischaracterize MGE's claim and the claims of other policyholders as falling under the communicable disease section of the Policy knowing this section of the policy would protect the insurer by limiting claims with sublimits.

103.    More recently, the CFO of Affiliated FM, Kevin Ingram, stated in an interview with *CFO Magazine* that because of the way the Affiliated FM polices are written, it has very little exposure to COVID-19 claims.   The CFO asserted that communicable disease claims will be limited by policy sublimits.   According to the article:

> Because of the policy sublimits, FM Global won't be on the hook for a devastating financial blow from communicable disease claims. The company is sitting on almost $15 billion of capital, and the potential claims are no more than the tens of millions of dollars, according to Ingram.

See https://www.cfo.com/risk-management/2020/03/insurer-fields-communicable-disease-claims.  (Last accessed June 23, 2020).

104.    The CFO stated that civil order claims will be denied because "there has to be a discrete insurable event that caused the loss.  Notably, the policy doesn't cover government-mandated closures, such as in the current case of restaurants and bars in many jurisdictions."  But the CFO did agree that a civil order claim might be valid, acknowledging that "There had to have been someone who was actually on-site with the disease."  *Id*.

105.    To carry out the scheme to avoid paying legitimate business interruption claims, Affiliated FM engaged in a pattern of deception by preparing and circulating a talking points memorandum that set forth prepared and pre-scripted answers for all of its adjusters to use when

addressing COVID-19 claims by any of its policyholders that would result in a predetermined result—a denial—without investigation into the particular facts of the policyholder's claim.

106.    Affiliated FM instructed its adjusters to interpret the policy in a contradictory-to-its-terms and deceitful manner so that COVID-19 claims will be permitted as "property damage" under the communicable disease section of the Policy which allows claims for the presence of a transmissible disease.  But all other COVID-19 claims are to be denied on two grounds – that COVID-19 is a virus which falls under the exclusion for contamination, and while COVID-19 may be "property damage," it is not "physical damage" under the Policy's civil authority section.

107.    Affiliated FM used these talking points to prepare the May 4, 2020 letter to plaintiff, which mirrored the talking points rationale for denial of coverage.  These talking points have been used as a basis to deny coverage to other policyholders.  *See, e.g., Treasure Island v. Affiliated FM Ins. Co*., Dkt. No. 20-cv-00965 (D. Nev. Complaint filed May 28, 2020), attaching talking points memorandum and alleging deceitful practices in using the memorandum to deny claim by mischaracterization and misdirection of claim).

108.    Despite MGE having established that there was an actual COVID-19 positive person at the College (a circumstance the Affiliated FM CFO acknowledged would be a basis for civil authority coverage), that the Tribe closed the AMCR because of that communicable disease incident, and that the College is within five miles of the AMCR, Affiliated FM has relied on these deceptive practices to obfuscate, delay and deny in addressing MGE's claim for coverage, thereby causing MGE to suffer substantial monetary losses.  As a consequence, MGE is entitled to both compensatory and punitive damages.

## Count 4 – Fraud

109.     Plaintiff incorporates by reference, as if fully set forth herein, the facts set forth in the foregoing paragraphs.

110.     MGE entered into a contract with Affiliated FM with the expectation that Affiliated FM would act in good faith and fair dealing in assessing MGE's claim for coverage.

111.     The talking points memorandum establishes that Affiliated FM had no intention of acting in good faith and in fact, created a pre-conceived and prepared basis for denial of any and all COVID-19 claim that may be related to civil closure orders.

112.     Affiliated FM engaged in an egregious pattern of misconduct aimed at MGE and more broadly at the public, that is, any company that purchased a standard form policy from Affiliated FM, when it concocted a falsified and pre-scripted basis for denial of coverage that is contradictory and nonsensical and meant to deter claims or to steer claims to a section of the Policy where denial is assured.

113.     Affiliated FM never sought to investigate the MGE claim, and it engaged in actions such as development and use of the talking points against MGE that show Affiliated FM had no intention of fulfilling its contract, no matter the facts. Affiliated FM's other acts substantiating fraud include failing to respond timely to MGE's requests and Sworn Statement in Proof of Loss; creating the fraudulent "talking points" memorandum; using the "talking points" rationale to deny and or disregard myriad claims of similarly-situated insured across the United States; empowering and instructing its adjusters to provide false information to MGE and its agent in the processing of the claim; scheming to avoid liability for civil closure order claims; and otherwise.

114.    The aforesaid conduct proximately caused damages to MGE, and therefore Affiliated FM should be liable for compensatory and punitive damages, as well as costs and attorneys' fees relative to MGE's claim.

### PRAYER FOR RELIEF

Wherefore, MGE prays for the following relief against Affiliated FM:

1.  Pursuant to 28 U.S.C. § 2201, Plaintiff seeks a declaratory judgment from this Court declaring the following:

(a) the presence of a communicable disease is physical damage of the type insured under MGE's Policy, and MGE's claim meets the requirements of Section E.2 of the Policy;

(b) MGE's losses incurred in connection with the Closure Orders and the ensuing interruption of its business are insured losses under the Policy's Civil Authority Section E.2;

(c) Affiliated FM shall not deny coverage on the ground that the only policy sections available to MGE are Sections D.5 and E.3, relating to Communicable Diseases;

(d) Affiliated FM shall not deny coverage on the ground that the policy excludes claims based on viruses when the Policy covers communicable diseases;

(e) Affiliated FM is obligated to pay MGE for the full amount of the business interruption losses incurred and related to the Closure Order and the necessary interruption of its business, including coverage under the Extended Liability Period until the Closure Order is rescinded or the AMCR is otherwise able to re-open safely in an amount of lost gross earnings to date to be determined by the Court and which is well in excess of $75,000.

2.  A finding that Affiliated FM breached the contract and an award of damages in the amount of at least $15,261,256, which is the amount of lost gross earnings to date, and other

such sums as may supplement this amount going forward, together with consequential damages in the amount of $6,945,415, as well as expenses and attorneys' fees.

3.  A finding that Affiliated FM violated NY General Business Law § 349 and an order awarding compensatory and punitive damages, as well as attorneys' fees and expenses to MGE.

4.  A finding that Affiliated FM engaged in fraud and an award of punitive damages.

4.  Other such relief as the Court may find just and proper.


**PLAINTIFF RESPECTFULLY DEMANDS A TRIAL BY JURY**

Plaintiff demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated:  Buffalo, New York
        June 23, 2020

                                      Respectfully submitted,

                                                        /s
                                      _____
                                      Marsha K. Schmidt, Attorney-at-Law
                                      Marsha K. Schmidt Bar Number:  512364
                                      Lead Counsel for Plaintiff Mohawk Gaming Enterprises, LLC
                                      14928 Perrywood Drive
                                      Burtonsville, MD 20866
                                      Telephone:  (301) 949-5176
                                      Fax:  (301) 949-5176
                                      E-mail:  marsha@mkschmidtlaw.com


                                    _____
                                      Lisa A. Coppola, Esq.
                                      Lisa A. Coppola Bar Number:  513450
                                      Co-counsel for Plaintiff Mohawk Gaming Enterprises, LLC
                                      The Coppola Firm
                                      3960 Harlem Road
                                      Buffalo, NY  14226
                                      Telephone: (716) 839-9700
                                      Fax:  (716) 408-9220
                                      E-mail:  lcoppola@coppola-firm.com